1

2

3

4

5              **IN THE UNITED STATES DISTRICT COURT**

6            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

7

8    LILLIAN ALONZO,                        No. 1:04-cv-6676-OWW-TAG

9             Plaintiff,                    REPORT AND RECOMMENDATION
                                            ON PLAINTIFF'S APPEAL FROM
10           vs.                            ADMINISTRATIVE DECISION

11   MICHAEL ASTRUE,                        REPORT AND RECOMMENDATION TO
     Commissioner of Social Security,[1]    REMAND CASE PURSUANT TO SENTENCE
12                                          FOUR OF 42 U.S.C. § 405(g)

13            Defendant
                                           REPORT AND RECOMMENDATION TO
14   _____/            ENTER JUDGMENT FOR PLAINTIFF
                                           AND AGAINST DEFENDANT

15
                           **INTRODUCTION**
16

17          Plaintiff Lillian Alonzo ("Claimant") seeks judicial review of an administrative decision

18   denying her claim for Supplemental Security Income ("SSI") benefits due to her disabilities,

19   pursuant to Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq. Pending before the Court

20   is Claimant's appeal from an administrative decision of the Commissioner of Social Security

21   ("Commissioner"). Claimant filed her complaint on December 9, 2004 (Doc. 1), and her opening

22   brief on October 17, 2005. (Docs. 1, 17). The Commissioner filed an opposition to the appeal on

23   November 21, 2005. (Doc. 18). Claimant did not file a reply brief.

24   _____

25      [1] Michael J. Astrue is substituted for his predecessor, Jo Anne B. Barnhart, as Commissioner of the
     Social Security Administration. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

26

27

28

                                               1

1                                    **JURISDICTION**

2          On November 23, 2001, Claimant filed an application for SSI. (Administrative Record

3   ("AR") 63-66). Claimant's application was denied initially (AR 43) and on reconsideration (AR 44).

4   After timely requesting a hearing, Claimant and her counsel appeared before Administrative Law

5   Judge ("ALJ") James N. Baker on June 23, 2003. (AR 24-42). On September 9, 2003, ALJ Baker

6   issued a written decision finding that Claimant was not disabled and, therefore, not eligible for SSI.

7   (AR 14-22). The Appeals Council denied Claimant's request for review on October 12, 2004. (AR

8   6-8). The Appeal Council's decision, therefore, became the final decision of the Commissioner,

9   which is appealable to the district court pursuant to 42 U.S.C. § 405(g). The initiation of an appeal

10  in the district court must be commenced within sixty (60) days of the Appeal Council's decision.

11  42 U.S.C. § 405(g). On December 9, 2004, Claimant timely filed this action. (Doc. 1).

12                                **STATEMENT OF FACTS**

13          In Claimant's SSI disability report, she alleged that she was incapable of working because

14  she had (1) an injured back; (2) stomach and leg pain; (3) arthritis, which caused pain, in her hands,

15  back, and knee; (4) headaches; (5) an unknown ailment that made her vomit; and (6) "deep

16  depression." (AR 73). The Social Security Administration ("SSA") determined that Claimant's

17  alleged onset date was the date that she filed her SSI application, i.e., August 29, 2001. (AR 68).

18          At the June 3, 2003, hearing before the ALJ, Claimant testified that she was born on

19  December 26, 1956, making her 46 years old at the time of the hearing. (AR 26). Claimant stated

20  that she had dropped out of school when she was in the eighth grade, but had obtained her GED in

21  1990. (AR 26-27). With respect to her employment history, Claimant testified that she last worked

22  in 1999 as an order taker at a copy center for approximately ninety days before she was fired.

23  (AR 28).

24          Regarding the ailments that rendered her disabled, Claimant testified that one reason she

25  could not work was due to her myriad emotional problems. (AR 29). According to Claimant, she is

26  forgetful, cannot concentrate or remember things, depressed with daily crying episodes and suicidal

27  ideation, paranoid, distrustful of others, and anxious. (AR 29-31, 33, 38). She testified that one of

28

                                            2

1  the reasons that she no longer drove a car was because she suffered panic attacks and that she had
2  been fired from her last job in 1999 because of her anxiety and crying episodes. (AR 27-28).
3  Claimant added that she had a history of alcohol and IV drug abuse, but had stopped using illegal
4  drugs in 1987. (AR 33-34). With respect to her other medical problems, Claimant testified that she
5  had continued to suffer pain and weakness from surgery she had undergone approximately fifteen
6  years earlier to repair a cut tendon in the middle finger of her right hand. (AR 34-35). She stated
7  that this made it difficult for her to grasp things. (AR 34). Claimant noted that she also suffers
8  constant pain in both knees, "almost constant" pain in her lower back and her head, and that she has
9  migraine headaches. (AR 35-36). She reported that her neck pain had improved but remains bad
10  enough to contribute to her disability, remarking that she is "just tired of living in pain." (AR 35).
11  According to Claimant, she is constantly tired, which she thinks that her doctor said was due to her
12  depression. (AR 37). When questioned by the ALJ, she stated that she was not aware that her
13  medical records indicated that had fibromyalgia and, possibly, anemia. (AR 35-37).

14      As to her living situation and daily life activities, Claimant testified that she is homeless,
15  sometimes living on the street and sometimes with a friend. (AR 31-32). Claimant stated that,
16  because her friend knew how she felt, she was not expected to help with any chores when she stays
17  with the friend. (AR 37). Claimant further testified that she cooks her own meals about once a week
18  when at her friend's house, but otherwise buys food and sandwiches with her food stamps. (AR 32).
19  As to her exertional abilities, Claimant testified that she can remain on her feet for less than an hour
20  before her lower back and legs start to hurt. (AR 37-38). Likewise, Claimant stated that sitting for
21  over an hour causes a lot of pain in her back. (AR 38). Claimant also testified that she can lift only
22  less than 10 pounds. (Id.).

23                          **Claimant's Medical Records**

24      According to Claimant's medical records, many of which are illegible, Claimant was treated
25  by Dr. Rita H. Gogna, and at Doctors Medical Center ("DMC"), Orangeburg Medical Center
26  ("OMC"), Tuolumne Indian Health Center ("TIHC"), Stanislaus County Department of Mental
27  Health and its clinic and/or hospital, Stanislaus Behavioral Health Center (collectively referred to as
28  "SBHC"), and Stanislaus County Health Services Agency ("HSA"). (See generally AR).

3

1          Pursuant to Dr. Gogna's orders, Claimant had a lumbar spine radiograph on August 9, 1999.
2  The radiologist's impressions were that she had moderate L5-S1 degenerative disk disease and a
3  lumbar vertebral curve for which a normal anatomical variant vs. a musculoligamentous spasms
4  should be ruled out. (AR 129). Claimant saw Dr. Gogna on September 3, 1999, complaining of low
5  back pain. It appears that Dr. Gogna diagnosed an infection, because she prescribed Cipro in
6  addition to Vicodin (same as Norco) for Claimant's back pain. (AR 125). On November 2, 1999,
7  Claimant presented with back pain, for which she was prescribed Motrin twice daily, and told to
8  apply heat. The Motrin was refilled three times in November without an office visit, but her request
9  for Vicodin was denied. In early December, Claimant came to Dr. Gogna's office asking why she
10  was denied Vicodin for her back pain and informed the staff that she would switch physicians so that
11  she could be given prescriptions for the medication she needed. (AR 123).

12         Claimant called Dr. Gogna's office on December 20, 1999, reporting that she locked herself
13  in her bedroom and had suffered a headache for one week. She further informed the doctor's staff
14  that she had been hearing voices telling to hurt her, which scared her. On being advised to go to
15  SBHC or call the police, Claimant said that she was too scared to leave her bedroom or let anyone
16  else enter her bedroom. Claimant was told to call her husband at work. (AR 123). The office
17  contacted Claimant later, who reported she could not reach her husband. Finally, the doctor's office
18  telephoned Claimant's husband and told him that his wife had to be admitted to SBHC and he should
19  call the police to take her there. (AR 122).

20         On January 21, 2000, Claimant presented complaining of low back pain. She reported that
21  she was taking Celexa (an antidepressant), amitriptyline (a trycyclic antidepressant also prescribed
22  for chronic pain and sleep), and Tegretol (anti-seizure medication also prescribed for, inter alia
23  depression, migraine headaches, and alcohol withdrawal). Dr. Gogna prescribed naprosyn (non-
24  steroidal anti-inflammatory drug) and Vicodin. (AR 120).

25         Claimant presented at Dr. Gogna's office on April 4, 2000, complaining of increased back
26  pain, for which she was prescribed Vicodin and ordered to get an MRI. (AR 118). The radiologist
27  reported that Claimant's April 16, 2000 records evidenced that she had mild degenerative disc
28  disease at L4-5 and L5-S1. (AR 127).

4

1           Between January 11, 2001, and June 20, 2001, Claimant went to DMC four times.

2   (AR 130-141). On January 11, Claimant complained of stomach problems, which, due to the

3   doctor's handwriting, the exact nature of which and possible diagnosis cannot be ascertained.

4   (AR 141). Claimant underwent an endoscopy – specifically an "Escophagogastroduodenscopy with

5   biopsy and Maloney dilatation of the esophagus" - which revealed that Claimant had some retained

6   food in her stomach, a mildly spastic and traversed pylorus (tubular portion of the stomach). The

7   resulting impression indicated that Claimant's esophagus was normal except for a closed

8   gastroesophageal junction as evidenced by Maloney dilators, a gastropscopy showing a small

9   amount of retained food in the stomach, and a mildly spastic pylorus. (AR 139-40). The doctor

10  recommended two further diagnostic tests, one of which – a gastric emptying examination – was

11  performed on February 7, 2001. (AR 138, 140). The February 7 test indicated that Claimant had a

12  "slow but progressive emptying of the stomach into the small bowel," rendering an impression of an

13  "[a]bnormally prolonged gastric emptying time." (AR 138).

14          Claimant went to the DMC emergency room on February 11, 2001, complaint of a severe

15  left-sided headache all day that has caused her to vomit four times. She reported that her present

16  medications were Amitriptyline, Tegretol, Pepcid, Biaxin (antibiotic), Trimox (antibiotic), and Soma

17  (muscle relaxant for pain caused by muscle-spasms). The doctor concluded that Claimant had a

18  migraine headache, gave her two injections of Demerol and one shot of Phenergan for nausea, and

19  sent her home with a prescription for Vicodin. (AR 136).

20          On June 12, 2001, Claimant underwent a hepatobiliary scan with gallbladder ejection fraction

21  test (a scan to assess the functionality of the liver and determine what may be causing pain in the

22  gallbladder when gallstones are not present) of the liver due to her complaints of epigastric pain.

23  The hepatobiliary scan was normal but the gallbladder ejection fraction, which normally is 35% or

24  more, was 87%. No additional information or plan was referenced. (AR 134).

25          Claimant went to the DMC emergency room on June 20, 2001, complaining of lower back

26  pain. According to Claimant, she had seen her primary care physician earlier that day and he

27  advised her to go to the emergency room for pain relief. Claimant stated that she had a history of

28  depression and chronic lower back pain, for which she was taking Zoloft (antidepressant) and Norco

5

1  (same as Vicodin). (AR 132). The doctor diagnosed Claimant with recurrent lower back pain, gave

2  her an injection of both Demerol and Phenergan, which alleviated the pain, and told her to follow-up

3  with her regular physician.

4  Claimant sought treatment at OMC approximately ten times between September 29, 2000

5  and August 21, 2001. (AR 143-156). On September 29 and November 1, 2000, Claimant had

6  follow-up appointments after she had been prescribed Aciphex (used to treat, inter alia, ulcers and

7  gastroesophageal reflux disease (GERD)) and undergone tests for her acid reflux and right-sided

8  abdominal pain. The doctor noted that her upper GI indicated that Claimant likely had showed

9  gastric paresis ("stomach paralysis" resulting in stomach contents emptying too slowly into small

10 intestine) and edematous changes of the duodenal bulb (widened part of first part of small intestine

11 connected to the stomach via the pylorus) with probable ulceration. Claimant's reported history

12 included migraine headaches, depression, low back pain, positive hepatitis C but normal liver

13 function tests, gastroparesis, and probable duodenal ulceration. The doctor prescribed Reglan (drug

14 to treat GERD and ulcers), continued Aciphex, increased the Norco, and scheduled an appointment

15 for Claimant to see a gastroentologist. (AR 156).

16 Claimant returned to OMC twice in January 2001 for follow-up visits. Claimant reported

17 that she had experienced no relief from either the Aciphex or the Reglan. She had an EGD with Dr.

18 Peter Nielsen, after which she developed the shingles. Claimant requested refills of Norco and

19 Soma, and the doctor prescribed 120 of each to last ten and thirty days respectively. In addition,

20 despite the fact that earlier labs indicated that Claimant's thyroid functioned normally, because

21 Claimant complained that she had been gaining weight without eating more than usual, the doctor

22 ordered a repeat set of labs. (AR 154-55).

23 On February 28, 2001,[2] Claimant presented at OMC complaining of a migraine headache

24 with nausea that woke her up. She was treated by a family nurse practitioner ("FNP"), who reported

25 that Claimant's headache was her typical migraine, and noting that she had never tried Imitrex to

26 treat her migraines. Claimant was given Compazine for the nausea and Maxalt (cerebral

27

28  [2] It is not clear whether this visit occurred on February 8 or February 28, as both dates are on the medical record. (AR 153).

6

1    vasoconstrictor used to relieve migraine headaches as they occur), after which she reported that she
2    felt better. The FNP provided her with samples of Maxalt and instructed her to take one at the onset
3    of a headache. (AR 153). A brief note dated February 28, 2001, stated that Claimant had a history
4    of migraines, was unable to keep anything down, appeared lethargic, and was treated with
5    Compazine. (AR 152).

6         Claimant saw Dr. David Howe at OMC on May 18, 2001, complaining that she had a sore
7    throat, was constipated, and had been vomiting. Dr. Howe prescribed a medication to treat the
8    constipation, a Z-Pak (antibiotic), and Xanax (for anxiety). (AR 150). Claimant contacted OMC on
9    June 14, 2001, requesting Oxycontin (morphine-like narcotic pain medication) and complaining that
10   she continued to vomit and have stomach problems. Aciphex and Imitrex (similar to Maxalt) were
11   prescribed. (AR 148).

12        On June 20, 2001, Claimant presented complaining of severe lower back pain. An FNP
13   treated her. Claimant stated that the pain had not changed, but she had run out of Norco and had not
14   helped when she last took it. Claimant requested a pain shot, but was referred to the hospital
15   because OMC did not have the pain medication on hand. The FNP would have Dr. Howe refill the
16   Norco. Dr. Howe approved the FNP's report on June 27. (AR 147).

17        Dr. Peter Nielsen took x-rays of Claimant's left knee on June 27, 2001, and reported that it
18   was normal. He noted that an esophagram had been ordered, which Claimant refused after he
19   explained the procedure. (AR 146).

20        Claimant saw Dr. Howe on June 29, 2001, complaining that she had the flu. The doctor
21   prescribed Aciphex and refilled her Norco. (AR 145). On August 10, 2001, Claimant presented
22   complaining of stomach attacks that went up to her throat. The doctor noted that Claimant needed
23   another consult with a gastroenterologist. He prescribed Nexium (used to treat gastroesophageal
24   reflux, heartburn, or, in conjunction with antibiotics, to treat duodenal ulcers) and Imitrex. (AR 144).
25        On June 28, 2002, Claimant was referred to SBHC by her primary care physician ("PCP")
26   for an evaluation of her medication. The SBHC doctor noted that Claimant had a history of
27   depression, alcohol and drug abuse, and had been hospitalized for severe depression in 1999.[3] Her

28       [3] The discharge summary from her December 1999 hospitalization in SBHC, is included in the medical
     records. (See AR 182-85). Dr. Gogna, Claimant's PCP, referred her to SBHC for an assessment of her depression.

7

1   PCP had prescribed Paxil and Elavil, both of which she was taking. According to Claimant, the
2   Elavil helps her sleep but she has poor memory and concentration, decreased energy, crying spells,
3   and other symptoms of depression, including suicidal ideation. The psychiatrist diagnosed severe,
4   recurrent major depressive disorder with no psychotic symptoms. He prescribed a starter pack of
5   Serzone, instructed her to taper off of the Paxil, and decrease the Elavil if the Serzone improved her
6   ability to sleep. Claimant was to follow up at the Psychiatric Clinic in two weeks. (AR 179-80).

7          Claimant kept her July 12, 2002, follow-up visit but reported that her symptoms and mood
8   had not changed with the Serzone, although her appetite decreased. She stated that she continued
9   using Elavil to sleep. The psychiatrist told Claimant to continue taking Serzone as instructed and
10  follow up in one month. (AR 178). On August 20, 2002, Claimant reported that the Serzone made
11  her feel much better, but she continued taking Elavil to sleep. She complained that her back hurt
12  because she had run out of pain pills. (AR 177). The last submitted record from the Psychiatric
13  Clinic reported  Claimant's September 19, 2002, visit. The psychiatrist documented that Claimant
14  was upset and angry because her daughter had been assaulted by her boyfriend. Claimant stated that
15  she felt like killing the boyfriend. Claimant added that she was suicidal, but had no plans. She was
16  prescribed Lexapro in lieu of Serzone, which the psychiatrist wanted her to slowly stop taking, and

17

18  Claimant's mental health diagnoses on admission and discharge were (1) major depressive disorder, recurrent, without
    psychotic features; (2) polysubstance dependence; (3) global assessment of functioning was thirty upon admission; it
19  was sixty-five when she was discharged three days later. The psychiatrist started her on Celexa (antidepressant); Elavil
    (for sleep); and Tegretol. (AR 182). When Claimant was discharged, the doctors referred her to a counselor, made an
20  appointment for her to see her PCP for her medication, advised her to attend Alcoholics Anonymous meetings, and
    opined that her prognosis was fair-to-good if she followed their instructions. (AR 185). In addition, there is a one-page
21  treatment summary, apparently prepared by a licensed clinical social worker, which indicates that SBHC treated
    Claimant for depression and panic attacks in 1992. The summary noted that, although Claimant made some progress
22  during the three months she was treated, she "then stopped coming in." (AR 186). The diagnoses included dysthymia
    (chronic depression), panic disorder without agoraphobia, and polysubstance dependence. (Id.).

23

24

25

26

27

28

8

1   Elavil. As required by the law, the doctor warned the daughter's boyfriend about Claimant's threats.

2   (AR 391-392, 388-389).

3          Claimant commenced intermittent treatment at TIHC and its related Primary Care Center

4   ("P.C.") in 1993, and, in 1998, started seeing Steve Acuna, a family nurse practitioner ("FNP

5   Acuna") at TIHC on a more regular basis. (See AR 189-247). In September and October 1993,

6   Claimant had a series of lab tests, which revealed that she had Hepatitis C. (AR 243-247). On May

7   8, 1998, FNP Acuna diagnosed Claimant with situational anxiety and insomnia related to her

8   husband's health problems and shoulder pain due to right trapezes and cervical spine muscle spasms.

9   He prescribed an anti-anxiety medication, recommended gentle range-of-motion movements, and

10  told her not to work until the status of her husband's health was determined. (AR 237-238). On

11  November 9, 1998, Claimant presented complaining of a bad cough or bronchitis that has caused

12  low back pain and she needed a refill of her albuterol inhaler. Claimant reported that she had a

13  history of lumbar spine pain that was exacerbated in a 1995 motorcycle accident. FNP Acuna

14  diagnosed acute bronchitis, reactive airway disease, and chronic lumbar spine pain with a recent

15  exacerbation. He refilled her inhaler, prescribed Septra DS (antibiotic) and generic Vicodin

16  ("Vicodin") for pain, and ordered lumbar spine x-rays. (AR 236). Claimant returned on December

17  8, 1998, and saw someone other than FNP Acuna. She requested refills of Vicodin and clonzaepam

18  for her chronic back pain and muscle spasms, respectively. Claimant also complained that she

19  recently was treated for sinusitis and still had an occasional high fever, difficulty breathing, chest

20  congestion, headaches, and a cough. Her assessment was acute sinusitis, bronchitis versus early

21  pneumonia, and chronic low back pain secondary to trauma. Claimant's Vicodin and clonzaepam

22  were refilled, a prescription was written for Phenergan with codeine (antihistamine, decongestant,

23  cough suppressant), she was given Augmentin (antibiotic), instructed to purchase and take

24  ibuprofen, and reminded to have the x-rays taken that FNP Acuna ordered in November. (AR 235).

25          Claimant went to TIHC four times in 1999. (AR 234-28). On January 22, she presented

26  complaining of worsening spasms when she lays down to sleep, worsening lumbar spine pain, and

27  right leg radiculopathy. She explained that she now was on an HMO medical plan, and her only

28  prescribed medication was Lortab (same as Vicodin), which did not seem to help. FNP Acuna's

9

1   assessment was chronic lumbar spine pain with recent exacerbation and right leg radiculopathy, for
2   which he increased her Lortab, prescribed a muscle relaxant, and advised her to speak to her PCP
3   regarding an orthopedic evaluation and an MRI. (AR 234). Claimant returned on January 29, 1999,
4   for a follow-up appointment and reported that the medications had helped "quite a bit," and she had
5   scheduled an appointment with her PCP to request an MRI. FNP Acuna referred her back to her
6   PCP and instructed her to continue taking her medications as needed and performing her range-of-
7   motion exercises. (AR 233). On June 28, Claimant returned because she was concerned about her
8   Hepatitis C. FNP Acuna ordered lab tests and discussed the effects that Claimant's medications
9   could have on her liver. (AR 232). Claimant presented on July 19, 1999, to discuss the results of
10  her lab tests, complaining that her lumbar spine pain had been increasing, she had occasional muscle
11  spasms, and insomnia. She asked that her generic Vicodin be refilled and a muscle relaxant be
12  prescribed. FNP Acuna noted that, except for high cholesterol, Claimant's lab results were normal.
13  He refilled her Vicodin after discussing the risk of dependency and effects on her liver, prescribed
14  Lorazepam (anti-anxiety medication that causes drowsiness), and advised her that she needed to
15  have her low back worked up. (AR 228).

16          Claimant returned to TIHC on October 8, 2001, stating that she no longer had insurance and,
17  thus, had to stop seeing her PCP. Claimant reported that she had a long history of anxiety and
18  depression, for which she recently had been hospitalized at SBHC and prescribed Celexa,
19  Carbamazepine (Tegretol), and Amitriptyline (Elavil), which worked well but she ran out of a few
20  days earlier. Claimant further complained about her chronic low back pain, for which she was
21  prescribed Norco and Soma but, also, has none left and cannot afford to purchase. FNP Acuna noted
22  that Claimant was not working and she lived with her husband. (AR 226). He noted that her lumbar
23  spine was diffusely tender at L1-S1 and she had a flat affect, but was alert and oriented. He refilled
24  her psychotropic medications, provided samples of Ultram in lieu of Norco and Soma, and noted that
25  Claimant would try to continue seeing her counselor at SBHC. (AR 227). On October 26, Claimant
26  presented complaining that (1) she was more depressed and angry, likely because her husband lost
27  his job and she cannot work due to her depression and back pain; (2) based on her history of
28  osteoarthritis, she wanted an evaluation of her persistent low back pain and arthritis in her hands;

1   (3) she had a history of insomnia, and cannot sleep unless she takes Elavil, which concerns her. FNP
2   Acuna observed that Claimant had diffuse joint pain and a flat affect. FNP Acuna also noted that
3   Claimant was one-month post withdrawal from chronic narcotics that she received from her PCP.
4   His diagnosis was acute depression, osteoarthritis, and a sleep disorder, for which he increased the
5   dosage of Celexa she took, refilled her Elavil, and prescribed Vioxx (non-steroidal medication to
6   treat arthritis-related pain and inflammation). (AR 225).

7       On November 5, 2001, Claimant went to the P.C. to start seeing a new counselor for her
8   depression, apparently because, lacking insurance, she no longer could continue therapy at SBHC.
9   (See AR 225). After an interview evaluation, during which Claimant answered multiple questions
10  about her symptoms and feelings, a diagnosis was prepared that included she may be suffering, inter
11  alia,(1) depression due to medication, medical condition, substance abuse, or primary depression;
12  (2) premenstrual dysphoric disorder; (3) dysthymic disorder; (4) post-traumatic stress disorder
13  ("PTSD"); and (5) pain disorder. (AR 213-24). On November 6, Claimant returned to P.C. to see a
14  counselor, who opined that she appeared calm and sedated, possibly due to her medications. His
15  diagnosis was that she suffered from depression and PTSD. (AR 209).

16      Claimant presented at TIHC on November 9, 2001, for (1) reevaluation of her chronic low
17  back pain and to restart taking 12 tablets of Norco daily; (2) depression, for which she recently
18  started seeing a counselor, Keith Kerns; (3) worsening right leg radiculopathy associated with her
19  chronic low back pain; and (4) insomnia, which is out of control. FNP Acuna observed that
20  Claimant's lumbar spine had not changed from her prior examination, she had questionable right leg
21  radiculopathy, and, although her affect was flat, when compared to her last visit it was more
22  animated. He gave her an injection of Toradol (non-steroidal anti-inflammatory drug used for short
23  term pain relief), refilled her Elavil to help her insomnia, prescribed Vicodin but not enough to allow
24  her to take 12 pills daily, and planned to obtain her lumbar spine x-rays from her PCP. (AR 212).

25      Claimant returned to P.C. on November 29, 2001, for her depression. She stated that she felt
26  trapped because she had no money and was homeless. The counselor's diagnoses remained that
27  Claimant was depression and had PTSD, and it appears that he consulted with her physician and
28  recommended that he prescribe Paxil. (AR 210).

11

1       On December 7, 2001, Claimant went to TIHC for a reevaluation of her depression. FNP

2  Acuna noted that the Paxil seemed to be helping her and her affect is not flat at present. He

3  determined that her depression was stabilizing and refilled her prescriptions for Paxil and Elavil.

4  (AR 208). On December 12, she saw her counselor and complained that she was more depressed

5  and in pain. Claimant reported that one of her close friends had been shot and died. She informed

6  her counselor that she had filed for SSI benefits. (AR 207).

7       Claimant presented at TIHC on December 20, 2001, complaining of congestion, coughing,

8  and facial pain. She stated that, with respect to her depression and insomnia, the medication has

9  made her much better. FNP Acuna diagnosed acute sinusitis and prescribed an antibiotic. (AR 206).

10      Claimant returned to TIHC on January 17, 2002, stating that she was angry and abusive

11  toward everyone at their children's home, where she and her husband are living since he cannot find

12  work. Claimant reported that, when she learned that one of her close friends had died, she went out

13  drinking. She also complained that she cannot afford Imitrex, which she had been taking for her

14  migraine headaches. Claimant, however, noted that counseling had proved beneficial and it,

15  together with her psychotropic medication, worked well when there were not multiple family

16  stressors. FNP Acuna told her to continue taking Elavil and minimal amounts of Vicodin, increased

17  the dosage of her Paxil, and gave her samples of Maxalt for her migraine headaches. (AR 212).

18  Claimant also had an appointment with her counselor on January 17, to whom she told that she felt

19  guilty about her friend's death, forgot to take her Paxil, and occasionally was suicidal but had no

20  plans. The counselor planned to consult with FNP Acuna regarding Claimant's medications and try

21  to get her husband to remind her to take the medications. (AR 204).

22      Claimant saw FNP Diane Conklin on January 31, 2002, complaining, inter alia, that she had

23  GERD symptoms that had not responded well when treated in the past with Aciphex. FNP Conklin

24  provided her with Aciphex. (AR 203). On March 1, 2002, Claimant kept a follow-up appointment

25  with FNP Acuna. Although her husband believed that she was becoming more depressed, Claimant

26  stated that the medication was working and she continued seeing her counselor. FNP Acuna

27  recommended that she have a full psychiatric evaluation at SBHC, but Claimant did not want to go

28  there because she was afraid that she would be hospitalized. Nonetheless, she and her husband said

12

1   that they would consider it. FNP Acuna noted that Claimant had a flat affect but no suicidal
2   ideation. He diagnosed depression and an anxiety disorder, refilled her Elavil and told her to
3   continue taking Paxil. (AR 199).

4       On March 28, 2002, Claimant telephoned her counselor and reported that she felt worse than
5   before, primarily because of multiple family-related stressors, including the death of her step-
6   brother. She was told to attend weekly AA meetings and keep a journal. (AR 198). On April 1, she
7   had appointments with FNP Acuna and her counselor. (AR 196-97). She told FNP Acuna that she
8   was doing well, the Paxil and Elavil helped her, and requested that he refill them, which he did. (AR
9   197). During her session with her counselor, Claimant reported that she was better than the last
10  week, partly because she took a break from watching the [grandchildren]. She stated that she had
11  suppressed her grief for her parents, so she went to her father's grave and planned to visit her
12  mother's grave as well. The counselor recommended that Claimant set boundaries with her
13  daughters and take time off from watching the grandchildren. (AR 196).

14      Claimant again saw both her counselor and FNP Acuna on May 1, 2002. (AR 194-95). FNP
15  Acuna diagnosed her as having anxiety and depression, both of which were stable, refilled her Paxil
16  and Elavil, and told her to continue counseling. (AR 195). Claimant told her counselor that she felt
17  good and had visited her mother's grave, which brought up a lot of memories and made her cry. The
18  counselor suggested that Claimant explore her past and process her resistance to therapy with respect
19  to her past painful issues. (AR 194). On May 21, 2002, Claimant called her counselor because she
20  felt tearful, moody, and anxious. She said she would call back for an appointment when she could
21  get a ride to P.C. (AR 193).

22      Claimant presented at TIHC on June 3, 2002, for refills of Paxil and Elavil and requested
23  something for her anxiety, explaining that she was under a lot of stress. She also complained of
24  urinary frequency and cold-like symptoms. FNP Acune diagnosed a urinary tract infection, acute
25  sinusitis, allergic rhinitis, depression, insomnia, and an anxiety disorder. He prescribed antibiotics,
26  allergy medications, diazepam (Valium), and refilled her other medications. (AR 192). On June 14,
27  Claimant kept her follow-up appointment and stated that she continued to be depressed, anxious, and
28  have problems sleeping. She reported that her medications are not helping very much and agreed to

13

1    see a psychiatrist at SBHC, to which FNP Acuna referred her. (AR 191).

2         On July 1, 2002, Claimant returned to TIHC for a reevaluation of depression, anxiety, and
3    GERD. She reported that she felt better overall. Claimant had been prescribed Serzone when she
4    was seen at SBHC, and that facility will continue to handle her psychotropic medications. FNP
5    Acuna refilled Claimant's Aciphex and diazepam, instructed her to continue her current medications,
6    and to follow up at SBHC and, in one month, at TIHC. (AR 190).

7         Claimant went to TIHC on July 15, 2002, for reevaluation of her depression, anxiety, and
8    insomnia. She reported that there had been no major changes and she was seeing a psychiatrist at
9    SBHC, which he will refill after today's appointment at TIHC. Claimant requested refills of
10   diazepam and Elavil, as well as Allegra because of her exacerbation of allergic rhinitis recently.
11   FNP Acuna advised her that he would not refill her psychotropic medications after this visit. He
12   diagnosed depression, anxiety, insomnia, and allergic rhinitis, and refilled her Elavil, Allegro, and
13   diazepam. He instructed Claimant to return to TIHC as needed. (AR 189).

14        Claimant was treated at HSA from June 27, 2002, through April 30, 2003. (AR 283-287,
15   334-385). Regardless of who the attending doctor was, Jason Cunningham, D.O., generally
16   supervised the treatment. (Id.). It is noteworthy that the HSA records include treatment notes and
17   lab reports from other health care facilities, some of which are discussed above.

18        The first treatment notes are from the orthopedic clinic at Scenic General Hospital, dated
19   June 30, 1987, when Claimant presented complaining of back pain after she injured her shoulder and
20   fractured her large left toe four days earlier. (AR 380-381). The following records are from
21   Stanislaus Medical Center ("SMC"), where, in September 1991, Claimant was diagnosed with acute
22   gastritis and possible food poisoning. (AR 378). She went to the SMC emergency room in January
23   1992 after being short of breath, frightened, and dizzy for three days. The doctor's assessment was
24   chest pain secondary to hyperventilation syndrome, for which he prescribed Valium. (AR 375-377).
25   In July 1992, labs indicated that Claimant had Hepatitis, which had resolved. (AR 368). Claimant
26   was treated several times throughout 1992 for various injuries and ailments, none of which were
27   unusual or would have any effect on the outcome of this action. (See AR 366-367; 369-374). She
28   did not return to SMC until January 1994 and, from then until the end of the year she received

14

1  treatment for minor injuries and typical illnesses. (See AR 360-365). In April 1995, she presented
2  complaining of pain after she had been assaulted. She was diagnosed with a bruised right hand, left
3  ankle sprain, and closed head injury. (AR 358-359).

4        Claimant presented at HSA on June 27, 2002, complaining of stomach problems, depression,
5  a sore in her mouth, migraine headaches, and a lump in her breast. She stated that she currently was
6  taking Paxil, Elavil, Soma, Norco, and Valium. The doctor diagnosed (1) depression with suicidal
7  ideation; (2) back and neck pain with tension; and (3) dental problems. He prescribed Vicodin for
8  her pain, planned to send her to SBHC for her depression and to a dentist, and would attempt to
9  obtain her last mammogram. (AR 292-293).

10              **Residual Functional Capacity ("RFC") Assessments**

11       On February 19, 2002, Marshall Collub, M.D. assessed Claimant's physical RFC, and
12  concluded that Claimant could occasionally lift and/or carry 20 pounds, frequently lift and/or carry
13  20 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour
14  work day, and had unlimited capacity to push and/or pull. (AR 158, 164). George A. Jansen, Sr.,
15  M.D. conducted a subsequent physical RFC on December 16, 2002. Dr. Jansen concluded that
16  Claimant could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand
17  and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour work day, and had
18  unlimited capacity to push and/or pull. Dr. Jansen also noted that Claimant had frequent postural
19  limitations with respect to balancing and kneeling, and occasional limitations with respect to
20  climbing, stooping, crouching, and crawling. (AR 295-296, 301).

21       On February 22, 2002, Charles House, PhD. conducted a comprehensive psychiatric
22  evaluation of Claimant. Dr. House diagnosed Claimant as suffering from a non-specified depressive
23  disorder and a polysubstance abuse disorder in remission, and determined that her depressive
24  disorder prognosis was guarded. (AR 259). Dr. House also concluded that Claimant has the
25  capacity to perform simple and repetitive tasks, and could handle two-and-three step problems. (AR
26  260). Dr. House also found that Claimant has the capacity to perform detailed and complex tasks
27  and to accept instructions from supervisors, but may have had difficulty interacting appropriately
28  with co-workers and the general public, and may have difficulty maintaining regular attendance in

15

1    work situations and may cause significant disruption in the workplace. (AR 260).

2         On January 21, 2002, Asman Ali, M.D. conducted a comprehensive internal medical
3    examination of Claimant, and diagnosed Claimant as suffering from depression, low back pain and
4    gastroesophageal reflux disease versus peptic ulcer disease. (AR 261-264). Dr. Ali also determined
5    that Claimant can lift and carry about 20 pounds of weight, stand and walk with breaks every two
6    hours for about six hours, sit with breaks every two hours for about six-eight hours, will have
7    difficulty doing repeated bending, stooping, crouching, and crawling movements, and may also have
8    difficulty pushing and pulling heavy objects. (AR 264).

9         On March 14, 2002, F. Mateus, M.D. diagnosed Claimant with non-specified depression and
10   non-specified personality disorder, and concluded that Claimant's  was capable of only minimal
11   contact with people within her physical tolerance. (AR172). A mental RFC, which appears to have
12   been conducted in March 2002, concluded that Claimant suffers a mild degree of restriction of
13   activities of daily living, and a moderate degree of limitation in difficulties in maintaining social
14   functioning, concentration, persistence, and pace. The March 2002 reflects that Claimant suffers
15   from non-specified depression. (AR 266-283).

16        On October 3, 2003, Nicholas Butowski, M.D., Neurology Senior Resident, conducted a
17   comprehensive orthopedic evaluation of Claimant, and diagnosed Claimant as suffering from low
18   back pain, and neck pain due to strain. Dr. Butowski also determined he would expect Claimant to
19   stand and/or walk for about six hours in an eight-hour workday, sit without restriction, lift and carry
20   up to 20 pounds on an occasional basis and 10 pounds on a frequent basis, "no more than this,
21   [p]ossibly due to exacerbating her pain. Dr. Butowski also concluded that Claimant is posturally
22   limited secondary to back pain with bending, stooping, climbing, kneeling, and pulling especially in
23   a repeated nature. (AR 248-253).

24                           **STANDARD OF REVIEW**

25        Congress has provided a limited scope of judicial review of a Commissioner's decision. See,
26   42 U.S.C. § 405(g). A court must uphold the Commissioner's decision, made through an ALJ, when
27   the decision is based on the proper legal standards and is supported by substantial evidence. Webb
28   v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005). Substantial evidence is more than a mere scintilla,

16

1   Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less than a preponderance.

2   McAllister v. Sullivan, 888 F.2d 599, 601-602 (9th Cir. 1989); Desrosiers v. Secretary of Health and

3   Human Services, 846 F.2d 573, 576 (9th Cir. 1988). Substantial evidence "means such evidence as

4   a reasonable mind might accept as adequate to support a conclusion."

5   Richardson v. Perales, 402 U.S. 389, 401 (1971) (citations omitted). Moreover, "such inferences

6   and conclusions as the [Commissioner] may reasonably draw from the evidence" will also be

7   upheld. Mark v. Celebrezze, 348 F.2d 289, 293 (9th Cir. 1965). On review, the court considers the

8   record as a whole, not just the evidence supporting the decision of the Commissioner. Weetman v.

9   Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (quotation and citation omitted).

10      It is the role of the trier of fact, not this court, to resolve conflicts in evidence. Richardson,

11  402 U.S. at 400. If evidence supports more than one rational interpretation, the court must uphold

12  the decision of the ALJ. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984). Moreover, if there is

13  substantial evidence to support the administrative findings, or if there is conflicting evidence that

14  will support a finding of either disability or nondisability, the finding of the Commissioner is

15  conclusive. Sprague v. Bowen, 812 F.2d 1226, 1229-1230 (9th Cir. 1987). Nevertheless, a decision

16  supported by substantial evidence will still be set aside if the proper legal standards were not applied

17  in weighing the evidence and making the decision. Brawner v. Secretary of Health and Human

18  Services, 839 F.2d 432, 433 (9th Cir. 1987).

19                          **RELEVANT LEGAL FRAMEWORK**

20      The Social Security Act defines "disability" as the "inability to engage in any substantial

21  gainful activity by reason of any medically determinable physical or mental impairment which can

22  be expected to result in death or which has lasted or can be expected to last for a continuous period

23  of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act also provides

24  that a claimant shall be determined to be under a disability only if her impairments are of such

25  severity that claimant is not only unable to do her previous work but cannot, considering claimant's

26  age, education and work experiences, engage in any other substantial gainful work which exists in

27  the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

28

17

1                               **Sequential Evaluation Process**

2        The Commissioner has established a five-step sequential evaluation process for determining

3 whether a person is disabled. 20 C.F.R. §§ 404.1520, 416.920. Step one determines if she is

4 engaged in substantial gainful activities. If she is, benefits are denied. 20 C.F.R. §§ 404.1520(b),

5 416.920(b). If she is not, the analysis proceeds to step two, which considers whether the claimant

6 has a medically severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(c),

7 416.920(c).

8        If the claimant does not have a severe impairment or combination of impairments, the

9 disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step,

10 which compares the claimant's impairment with a number of listed impairments acknowledged by

11 the Commissioner to be so severe as to preclude substantial gainful activity. 20 C.F.R. §§

12 404.1520(d), 416.920(d); 20 C.F.R. § 404 Subpt. P App. 1. If the impairment meets or equals one of

13 the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is

14 not one conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which

15 determines whether the impairment prevents the claimant from performing work she has performed

16 in the past. If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. §§

17 404.1520(e), 416.920(e). If the claimant cannot perform this work, the fifth and final step in the

18 process determines whether she is able to perform other work in the national economy in view of her

19 age, education and work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f). See Bowen v. Yuckert,

20 482 U.S. 137 (1987).

21        The initial burden of proof rests upon the claimant to establish a *prima facie* case of

22 entitlement to disability benefits. Rhinehart v. Finch, 438 F.2d 920, 921 (9th Cir. 1971). In terms of

23 the five step sequential evaluation process, the Ninth Circuit has held that "[t]he burden of proof is

24 on the claimant as to steps one to four," while at the same time noting that an ALJ's "*affirmative*

25 *duty* to assist a claimant to develop the record . . . complicates the allocation of burdens" such that

26 "the ALJ shares the burden at each step." Tackett v. Apfel, 180 F.3d 1094, 1098 & n.3 (9th Cir.

27 1999) (italics in original). The initial burden is met once the claimant establishes that a physical or

28 mental impairment prevents her from engaging in her previous occupation. The burden then shifts to

18

1   the Commissioner to show (1) that the claimant can perform other substantial gainful activity and (2)

2   that a "significant number of jobs exist in the national economy" which claimant can perform.  Kail

3   v. Heckler, 722 F.2d 1496, 1498 (9th Cir. 1984).

4                              **ADMINISTRATIVE FINDINGS**

5        **Step One**

6        The ALJ found at step one that Claimant "has not engaged in substantial gainful activity

7   during the last 15 years." (AR 21).

8        **Step Two**

9        At step two, the ALJ found that Claimant had the "severe" impairment of mild degenerative

10  disc disease of the lumbar spine. (AR 21).

11       **Step Three**

12       At step three, the ALJ assessed whether Claimant's impairment was among those

13  acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity.  See

14  20 C.F.R. § 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  The ALJ

15  concluded that Claimant did not have an impairment, or combination of impairments, that met or

16  medically equaled a listed impairment. (AR 21).

17       Notwithstanding the foregoing, the ALJ did find that Claimant's drug addiction and alcohol

18  abuse met the requirements of Listing 12.09, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (substance

19  addiction disorders).  At step five of the sequential analysis, infra, the ALJ employed this finding -

20  and the statutory preclusion of disability benefits where drug addiction is a contributing factor to

21  disability[4] - in assessing Claimant's residual functional capacity.

22       **Step Four**

23       At step four, the ALJ found that Claimant had no past relevant work. (AR 21).

24       **Step Five**

25       At step five, the ALJ addressed the statutory bar against an award of disability benefits where

26  drug addiction or alcoholism ("DA&A") is a contributing factor to disability.  42 U.S.C. §

27  423(d)(2)(C). (AR 22).  Upon holding that DA&A was a contributing factor and that benefits were

28       ---
         [4] 42 U.S.C. § 423(d)(2)(C).

1    therefore precluded, the ALJ then carved-out Claimant's DA&A-related impairments in order to

2    reach Claimant's non-DA&A residual functional capacity.  (AR 21).  Thus, the ALJ held that "[b]ut

3    for DA & A, the claimant has the residual functional capacity to perform the physical exertional and

4    non-exertional requirements of [light] work except for greater than occasional climbing, stooping,

5    crouching, and crawling."  (AR 21).  Given these non-DA&A limitations, and given claimant's age,

6    education and work experience, the ALJ concluded that a finding of not-disabled was directed under

7    "the Grids."  20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.20.  (AR 21).  The ALJ also found that

8    his reliance on the Grids was appropriate given that "claimant's capacity for the full range of light

9    work has not been significantly compromised by her additional non-exertional limitations."  (Id.).

10                                                **ISSUES**

11        Claimant's Opening Brief raised the following issues for consideration:

12        1.  Whether the ALJ properly applied the law regarding drug and alcohol abuse

13        2.  Whether the ALJ properly reviewed claimant's mental health record.

14        3.  Whether the ALJ properly assessed claimant's physical impairments.

15        4.  Whether the ALJ properly discounted claimant's testimony.

16        5.  Whether the ALJ properly discounted the opinion of Jason Cunningham, D.O.

17        6.  Whether the ALJ erred in failing to use a vocational expert.

18        This Court must uphold the Commissioner's determination that claimant is not disabled if the

19    Commissioner applied the proper legal standards and there is substantial evidence in the record as a

20    whole to support the decision.

21                                              **DISCUSSION**

22    **1.     Whether the ALJ properly applied the law regarding drug and alcohol abuse.**

23        In an argument heading, Claimant asserts that the ALJ "misapplied the law under drug and

24    alcohol abuse (DAA)." (Doc. 17, p. 7) (capitalization omitted).  The Commissioner admits that the

25    ALJ "did not follow" the analysis required by Bustamante v. Massanari, 262 F.3d 949 (9th Cir.

26    2001), but nevertheless contends that the ALJ's rationale "satisfies the intent" of Bustamante and

27    applicable regulations.  (Doc. 18, pp. 7-8).  However, given the clear mandate of Bustamante and the

28    Commissioner's own regulations, as discussed below, the undersigned finds that remand is required

                                                    20

1    so that a proper disability determination analysis can be performed.

2         As discussed above, the Commissioner has established a five-step sequential evaluation

3    process for determining whether a person is disabled.  20 C.F.R. §§ 404.1520, 416.920.  As noted in

4    Bustamante, this five-step analysis is just the beginning of the ALJ's deliberative process when drug

5    and/or alcohol abuse is involved:

6             A finding of "disabled" under the five-step inquiry does not
7         automatically qualify a claimant for disability benefits.  Under
          provisions added by the Contract with America Advancement Act,
8         Pub.L. No. 104-121, 110 Stat. 847 (March 29, 1996), an "individual
          shall not be considered to be disabled for purposes of [benefits under
9         Title II or XVI of the Act] if alcoholism or drug addiction would (but
          for this subparagraph) be a contributing factor material to the
10        Commissioner's determination that the individual is disabled."
11        42 U.S.C. § 423(d)(2)(C).

12   Bustamante, 262 F.3d at 955.  Only *after* the five-step sequential analysis is performed and a

13   disability found to exist does consideration of drug and alcohol abuse come into consideration.  Id.

14   As noted in Bustamante, the very first sentence of regulations implementing the drug and alcohol

15   abuse policy begin with the following conditional language: "[i]f we find that you are disabled . . . ."

16   20 C.F.R. §§ 404.1535 and 416.935.  Accordingly, and consistent with the regulatory scheme as

17   adopted by the Commissioner, the Ninth Circuit in Bustamante held as follows:

18
19        "[t]he ALJ should . . . proceed[] with the five-step inquiry *without*
          attempting to determine the impact of [claimant's] alcoholism on his
          other mental impairments.  If, and only if, the ALJ found that
20        [claimant] was disabled under the five-step inquiry, should the ALJ
          have evaluated whether [claimant] would still be disabled if he stopped
21        using alcohol."

22   Bustamante, 262 F.3d at 955 (bold italics added).  In Bustamante, the court found that it was error
23
     for the ALJ to have concluded "at step two that [claimant's] 'behavioral and emotional conditions'
24
     were 'the product and consequence of his alcohol abuse and not an independently severe or disabling
25
     impairment.'" Id.
26
          Here, as in Bustamante, the ALJ should have "proceeded with the five-step inquiry without
27
     attempting to determine the impact of [claimant's] alcoholism on [her] other mental impairments."
28
     Id.  Remand is therefore required "with instructions that the ALJ proceed with step three (and four

21

1  and five, if necessary) of the disability determination without attempting to separate out the impact

2  of [claimant's substance] abuse. Only if the ALJ determines that [claimant] is disabled under the

3  five-step inquiry, should the ALJ consider whether" substance abuse is a contributing factor material

4  to that determination pursuant to 20 C.F.R. § 416.935. Bustamante, 262 F.3d at 956.

5  **2.    Whether the ALJ properly reviewed claimant's mental health record.**

6          Claimant asserts that the ALJ did not properly consider her mental health record. (Doc. 17,

7  pp. 5-6). The undersigned agrees.

8          In a social security case, the ALJ has a "special duty to fully and fairly develop the record

9  and to assure that the claimant's interests are considered." Smolen v. Chater, 80 F. 3d 1273, 1288

10 (9th Cir. 1996) (quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)). In discharging this

11 duty, the ALJ is required to take appropriate steps to ensure that the record of information is

12 sufficient to address the questions raised by the medical evidence, in order to ensure a fair

13 determination of disability. See Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998, as amended Jan.

14 26, 1999). When necessary, this duty may require the ALJ to obtain additional information from

15 treating physicians, consult a medical expert, order a consultative examination, or call a medical

16 expert. See 20 C.F.R. §§ 404.1512(e), 404.1519a, 416.912(e), 416.919a; Armstrong v.

17 Commissioner , 160 F.3d 587, 590 (9th Cir. 1998). Conversely, the ALJ has no duty to develop an

18 existing record which is neither ambiguous nor inadequate for a complete and proper evaluation of

19 the evidence. Mayes v. Massanari, 276 F.3d 453, 459-460 (9th Cir. 2001) ("An ALJ's duty to

20 develop the record further is triggered only when there is ambiguous evidence or when the record is

21 inadequate to allow for proper evaluation of the evidence.").

22          Here, claimant does *not* contend that additional mental health records were required. (See

23 Doc. 17, pp. 5-6). Rather, she simply takes issue with the manner in which her mental health status

24 was reviewed by the ALJ: (1) there was no finding of "severe" mental impairment at step two (Doc.

25 17, p. 6) and (2) diagnoses of depressive disorder, with evidence of decreased concentration, energy

26 and worth, increased appetite and suicidal thoughts were misstated. (Id.).

27          · In addressing these concerns, it is apparent on the one hand that ALJ Baker took considerable

28 pains to discuss claimant's mental health history and her positive response to mental health

22

1    treatment. On the other hand, it is also apparent that ALJ Baker intermingled his assessment of

2    claimant's mental health status - and hence whether that status was "severe" and ultimately disabling

3    under the sequential analysis - with his consideration of claimant's substance abuse. As the ALJ

4    wrote:

> A mental capacity assessment by the State Agency found the claimant
> was not significantly limited in the majority of areas, while she had no
> evidence of limitation in other areas (Exhibit 15F). The claimant was
> hospitalized at the Stanislaus Behaviorial Health Center for 3 days in
> December of 1999. The discharge diagnosis included polysubstance
> dependence in partial remission. The claimant admitted alcohol
> problems and multiple drug use as well. She reported responding well
> to Zoloft in the past. She underwent DAA rehabilitation in 1985 and
> again in 1995. Among his recommendations, Dr. Castillo
> recommended the claimant pursue Alcoholics Anonymous meetings to
> prevent further relapsing of alcoholism (Exhibit 8F, pp. 8-9). The
> claimant reported she discontinued taking Zoloft as she felt she was
> getting better, but admitted to continued alcohol use (Exhibit 11F, p.
> 9). She appeared to approve with medication management and
> treatment. (Exhibit 11F).
>
> Medical records from Tuolomne Indian Health Center on December
> 20, 2001, report the claimant was doing much better with her
> medication dosage to the extent she was sleeping better and going to
> counseling on a regular basis (Exhibit 12F, p. 20). On January 17,
> 2002, she presented as very angry, and admitted she went out drinking
> after which she became abusive and got into a fight while [she] was
> under the influence of alcohol. She reported that counseling with
> Keith Kerns was very beneficial for her and that her antidepressant
> medication was working fairly well although she was experiencing
> multiple family stressors (Exhibit 12F, p. 19). On April 1, 2002, the
> claimant again reported improvement due to counseling to Keith Kerns
> and medication (Exhibit 12F, p. 11). On May 1, 2002, the claimant
> reported "feeling better overall" (Exhibit 12F, p. 9). Further
> improvement was noted on July 1, 2002 (Exhibit 12F, p. 4) and on
> October 4, 2002 by the Stanislaus County Behavioral Health and
> Recovery Services (Exhibit 21F, p. 13). The claimant was again
> admitted on October 21, 2002 on a 5150 (Exhibit 21F, p. 10). She
> discussed her long history of substance abuse problems, mostly using
> cocaine, alcohol, and marijuana, and her attendance at several
> rehabilitation treatment programs. A urine drug screen was positive
> for barbiturates, benzodiazepines, opiates, and cannabis (Exhibit 21F,
> pp. 6 and 3). Drug-seeking behavior was indicated on April 15, 2003
> (Exhibit 21F, p. 2).
>
> . . .
>
> The consultative psychiatric examiner, Dr. House, reported depressive
> disorder, not otherwise specified (NOS), without immediate suicidal
> ideation, plan, or intent, and without evidence of anhedonia,
> polysubstance disorder in remission per the claimant, personality

23

1
2
3
4
5

disorder, NOS, mixed type, and a Global Assessment of Functioning (GAF) of 55. Nonetheless, Dr. House indicated the claimant was not significantly limited at the work place on a mental basis, in that she was able to perform simple and repetitive tasks because of adequate intelligence, intact cognitive skills, no difficulty in handling 2- and 3-step problem resolution, and intact attention span and memory. She had not difficulty in performing more complex tasks and in accepting supervision, although she could have difficulty interacting appropriately with coworkers and the public, and maintaining regular attendance (Exhibit 13F, pp. 7-13).

6

. . .

7
8
9

[T]he record reflects several notations of [mental health] improvement with medication management and counseling by Keith Kerns (Exhibit 12F, pp. 20, 11, 9, and 4). Further improvement was noted in Exhibit 21F, p. 13, as of October 4, 2002. There was clearly improvement in the claimant's mental condition when she was actively involved with mental health treatment. . . .

10

11
12
13
14
15
16
17
18
19
20

Based on the substantial evidence of record, the only inference I can draw is that the claimant was abusing drugs and alcohol at least through October of 2002 (Exhibit 21F, p. 3). During that time, and for at least 1 year after that, it is very difficult to find that the claimant's DA&A was not material. Therefore, I find that DA&A is a contributing factor material to the determination of disability through October of 2003. Accordingly, I find that the claimant's condition met Listing 12.09, pursuant to Cooper v. Bowen. The medical record supports the following degree of mental functional limitation, secondary to DA&A through October 2003: moderate restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and 4 or more repeated episodes of decompensation, each of extended duration. Therefore, I find the claimant's polysubstance abuse met Section 12.09 of the Listing of Impairments, pursuant to Cooper v. Bowen through at least October of 2003. Therefore, pursuant to Public Law 104-121, disability benefits are precluded on this basis. (AR 18-20).

21    As noted above, Bustamante v. Massanari, 262 F.3d 949 (9th Cir. 2001), requires an ALJ to

22  "proceed[] with the five-step inquiry without attempting to determine the impact of [claimant's]

23  alcoholism on his other mental impairments. If, and only if, the ALJ found that [claimant] was

24  disabled under the five-step inquiry, should the ALJ have evaluated whether [claimant] would still

25  be disabled if he stopped using alcohol." Bustamante, 262 F.3d at 955. Had the ALJ appropriately

26  followed Bustamante, questions such as whether claimant's mental impairments were "severe" at

27  step two of the sequential analysis, and/or were ultimately disabling, would have been addressed and

28  answered prior to and apart from an assessment of claimant's substance abuse issues. Accordingly,

1  and given the analysis required by Bustamante, remand is required.

2  **3.   Whether the ALJ properly assessed claimant's physical impairments.**

3         Claimant asserts that the ALJ did not properly review and report upon the physical

4  impairments of record. (Doc. 17, p.5). She cites two examples: (1) radiographic evidence of her

5  disc disease and (2) the impact of her obesity. (Id.) As this Court can only address those issues that

6  are briefed, review is limited to the examples identified. See Bergfeld v. Barnhart, 361 F. Supp. 2d

7  1102, 1110 (D. Ariz. 2005) ("[a] reviewing federal court will only address the issues raised by the

8  claimant in his appeal from the ALJ's decision"). So considered, the undersigned finds no error.

9         **i.   Radiographic evidence of disc disease.**

10        In his written determination, ALJ Baker specifically cited the results from a lumbar MRI

11  dated April 16, 2000. (AR 17, 20, 127).[5] The findings from this MRI were that Claimant had mild

12  degenerative disc disease at L4-5 and L5-S1, with the disc space mildly narrowed at L5-S1. (AR

13  127). Claimant nevertheless asserts that the ALJ erred in not reporting upon a subsequent

14  radiographic test dated October 11, 2002. (Doc. 17, p. 5, AR 265). That test, however, had the

15  same findings as the previous MRI with respect to Claimant's alleged disc disease: moderate

16  narrowing of the L5-S1 disc space. (AR 265). Moreover, the October 11, 2002 test did not report

17  any issue at all with claimant's L4-5 disc, unlike the earlier MRI referenced by ALJ Baker.

18  (Compare AR 127 with AR 265). Accordingly, given the similarity of the various radiographic tests,

19  the ALJ's failure to cite the last such test in reporting upon the status and severity of Claimant's disc

20  disease was, at most, harmless error. Curry v. Sullivan, 925 F.2d 1127, 1129 (9th Cir. 1991) ("[t]he

21  harmless-error rule applies" in social security disability cases); Booz v. Sec'y of Health & Human

22  Servs., 734 F.2d 1378, 1380 (9th Cir. 1984) (applying harmless error rule).

23        **ii.   Obesity.**

24        The other alleged "evidence" not considered by the ALJ was "obesity." (Doc. 17, p. 5).

25  However, other than one phrase in one sentence of her brief regarding this supposed error, claimant

26  presents nothing more. (See id.)   When she filed for disability benefits, Claimant noted various

27  _____

[5] The citation in the ALJ's written determination is to an earlier radiograph dated August 9, 1999. (AR 17, 20,
28  129). That radiograph, like the April 16, 2000 MRI discussed by the ALJ, also noted moderate L5-S1 degenerative disc
disease with moderate narrowing of the disc space. (AR 129).

1    illnesses, injuries and conditions, but obesity was not among them. (AR 72-73). At her

2    administrative hearing, Claimant never once mentioned her weight or any problems related thereto

3    (AR 24-42) and, in her brief, claimant cited no medical reports that might include a diagnosis of

4    obesity. See Social Security Ruling ("SSR") 02-1p, 2000 WL 628049, *3 (Sep. 12, 2002) (medical

5    diagnosis of obesity is a factor in assessing whether a medically determinable impairment exists).

6    Finally, the undersigned notes that Claimant's body mass index ("BMI") based upon her height

7    (5' 3" to 5' 3.5") (AR 72, 250) and her reported weight over time reflects a BMI at or near the

8    borderline between overweight and minimal (Level I) obesity under guidelines issued by the

9    National Institutes of Health. See SSR 02-1p, 2000 WL 628049, *2. On at least one occasion in the

10   medical records, Claimant's reported weight was 168 pounds, with a resultant BMI *below* the obese

11   category.[6] (AR 136). Given these circumstances, and given that it is claimant's burden to establish

12   a *prima facie* case of entitlement to disability benefits, Rhinehart v. Finch, 438 F.2d 920, 921 (9th

13   Cir. 1971), the ALJ's failure to report upon the impact of Claimant's weight was, if error at all,

14   harmless. Booz, 734 F.2d at 1380.

15   **4.   Whether the ALJ properly discounted Claimant's testimony.**

16         Claimant asserts that ALJ Baker ignored and improperly discredited her testimony. (Doc. 17,

17   pp. 6-7). While ALJ Baker correctly cited one inconsistency with respect to substance abuse, the

18   undersigned finds that his misstatements as to other issues requires remand for reconsideration of the

19   credibility factors.

20         A two step analysis applies at the administrative level when considering a claimant's

21   subjective credibility. Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996). First, the claimant

22   must produce objective medical evidence of an impairment and show that the impairment could

23   reasonably be expected to produce some degree of symptom. Id. at 1281-82. If claimant satisfies

24   this test - and if there is no evidence of malingering - the ALJ can reject the claimant's testimony

25   about the severity of his or her symptoms "only by offering specific, clear and convincing reasons

26   for doing so." Id. at 1281. Such specificity is crucial so as to enable effective judicial review. See

27

28         [6] The BMI calculator used to perform this calculation may be found at the web site of the National Heart Lung
     and Blood Institute, http://nhlbisupport.com/bmi/.

1  Mersman v. Halter, 161 F. Supp. 2d 1078, 1086 (N.D. Cal. 2001)("The lack of specific, clear, and
2  convincing reasons why Plaintiff's testimony is not credible renders it impossible for [the] Court to
3  determine whether the ALJ's conclusion is supported by substantial evidence"); SSR 96-7p (the
4  ALJ's decision "must be sufficiently specific to make clear to the individual and to any subsequent
5  reviewers the weight the adjudicator gave to the individual's statements and reasons for that
6  weight").

7       Here, upon first setting forth a synopsis of Claimant's medical records (AR 17-19), the
8  following areas of inconsistency were identified by ALJ Baker. As discussed below, however, the
9  supposed inconsistencies were not as evident as ALJ Baker found:

10      i.    The first inconsistency used by ALJ Baker to reject Claimant's credibility was with
11  respect to her drug and alcohol abuse. Claimant testified that she had not used drugs since 1987.
12  (AR 19, 34). With respect to alcohol, Claimant answered "Yes, I did" when asked if she had "used"
13  since undergoing rehab in 1997. (AR 34). Notwithstanding Claimant's admitted, continuing use of
14  alcohol, ALJ Baker incorrectly stated that Claimant testified to having been "sober . . . from alcohol
15  since 1999." (AR 19). On the other hand, the ALJ did correctly report Claimant's December 23,
16  1999 admission to Manolito Castillo, M.D., of the Stanislaus County Department of Mental Health,
17  that she used marijuana. (AR 19, 183). The ALJ also correctly noted Claimant's "drug-seeking
18  behavior" in October, 2002. (AR 19). A medical report dated October 23, 2002 included laboratory
19  results of a urine drug screen that was "positive for barbiturates, benzodiazepines, opiates and
20  cannabis" and noted that Claimant was "put on [an] opiate withdrawal protocol." (AR 19, 323).

21      ii.   The second inconsistency cited in Claimant's testimony cited by ALJ Baker was with
22  respect to the improvement of her condition over time. Thus, the ALJ wrote that "claimant's
23  credibility was further undermined by her testimony at the hearing that she has had no improvement
24  since her alleged onset date, while the record reflects several notations of improvement with
25  medication management and counseling by Keith Kerns." (AR 19). It is true that there are notations
26  in Claimant's record regarding improvement of her depression during drug therapy (AR 190, 195,
27  197 206). However, while Claimant never mentioned such improvement (or, more specifically,
28  never mentioned physicians notes as to same), the fact is that the ALJ did not ask her about any such

27

1    periods of improvement.  (See AR 24-42).  Consequently, the fact that Claimant did not testify to

2    periods of improvement of her depression could simply be because she was never asked the

3    question.

4         iii.      Although his intent is unclear, the third inconsistency cited by ALJ Baker may be that

5    Claimant failed to testify as to drugs taken for her mental health problems.  Thus, the ALJ wrote that

6    "claimant testified her only pain medication was Acetaminophen, an over-the-counter medication.

7    She further testified she was taking Prevacid for stomach problems.  The record reflects other

8    medications secondary to her mental diagnosis." (AR 19).  However, Claimant testified at length as

9    to her anxiety and anti-depressant drugs, and the ALJ himself interrupted Claimant's testimony to

10   interject the purpose of one such drug as an anti-depressant:

11

| 12 | Atty: | And before the hearing, you handed me 100-milligram tablets of Seroquel.  Have they just been prescribed? |
|----|-------|-----|
| 13<br>14 | Claimant: | No, I've been taking them since I left the hospital, the [Stanislaus] Behavioral Center.  They're to help with anxiety. |
| 15<br>16 | Atty: | Okay, you had not brought those when the form was filled out? |
| 17 | Claimant: | Right, I had told your assistant it was Serzone when it was Seroquel, 100 -- |
| 18 | Atty: | Okay. |
| 19 | Claimant: | -- milligrams. |
| 20 | Atty: | So it was not Serzone -- |
| 21 | Claimant: | I -- |
| 22 | Atty: | -- at the time you filled out the form. |
| 23 | Claimant: | Right, I -- |
| 24 | Atty: | What was it? |
| 25 | Claimant: | It was Seroquel. |
| 26 | Atty: | How do you spell that? |
| 27 | Claimant: | S-e-r-o-q-u-e-l, 100-milligram tablets. |
| 28 | ALJ: | Yeah. |

28

| | | |
|---|---|---|
| 1 | Atty: | And you said as needed.  How often are you taking the Seroquel? |
| 2 | Claimant: | Maybe three times a week on an average. |
| 3 | Atty: | What's that to help you with? |
| 4 | Claimant: | It's kind of like -- |
| 5 | ALJ: | It's an antidepressant. |
| 6 7 | Atty: | Do you have any adverse side effects from any of your meds? |
| 8 | Claimant: | Nightmares. |
| 9 | Atty: | What causes that if you know? |
| 10 | Claimant: | The amitriptyline.  (AR 39-40). |

11      iv.     The fourth and final inconsistency noted by ALJ Baker was that the record "fails to

12  reflect any TENS home exercise or physical therapy for alleged musculoskeletal problems."  (AR

13  19). Apart from what the record states, the undersigned notes that the ALJ never inquired of the

14  claimant as to her involvement in, or her failure to undertake, a physical therapy program. (See AR

15  24-42).

16          In light of all of the foregoing, remand is required. Connett v. Barnhart, 340 F.3d 871, 875

17  (9th Cir. 2003) (when there are "insufficient findings" as to whether testimony should be credited as

18  true, court may remand to the Commissioner for "further determinations").

19  **5.      Whether the ALJ properly discounted the opinion of Jason Cunningham, D.O.**

20          Claimant asserts that the ALJ erred in discrediting the opinion of treating physician Jason

21  Cunningham, D.O. (Doc. 17, p. 6). For the reasons noted below, the undersigned finds that remand

22  is required on this ground as well.

23          The courts distinguish among the opinions of three types of physicians:  treating physicians,

24  physicians who examine but do not treat the claimant ("examining physicians") and those who

25  neither examine nor treat the claimant ("nonexamining physicians"). Lester v. Chater, 81 F.3d 821,

26  830 (9th Cir. 1996). As a general rule, a treating physician's opinion is given special weight because

27  of his or her familiarity with a claimant's physical condition. Id.; Fair v. Bowen, 885 F.2d 597, 604-

28  605 (9th Cir. 1989); see also Smolen v. Chater, 80 F. 3d 1273, 1285 (9th Cir. 1996) ("Because

29

1   treating physicians are employed to cure and thus have a greater opportunity to know and observe
2   the patient as an individual, their opinions are given greater weight than the opinions of other
3   physicians"); Social Security Ruling 96-2p, 1996 WL 374188, *1 (July 2, 1996) (the opinions of a
4   treating physician ordinarily should be given great weight).

5           Regardless of the weight given to a treating physician's medical opinion, it is not binding on
6   the ALJ with respect to the ultimate determination of disability. See Batson v. Commissioner of
7   Social Security Administration, 359 F.3d 1190, 1194-1195 (9th Cir. 2004) (treating physician had
8   opined that claimant "met or equaled the criteria" for a listed impairment under 20 C.F.R. § 404
9   Subpt. P App. 1, § 105C); Magallanes v. Bowen, 881 F. 2d 747, 751 (9th Cir. 1989) ("treating
10  physician's opinion is not, however, necessarily conclusive as to either a physical condition or the
11  ultimate issue of disability"). Accordingly, although entitled to great weight, a treating physician's
12  opinion is not conclusive and may be rejected by the ALJ under appropriate circumstances. Where a
13  treating physician's opinion is not contradicted by another physician, it may be rejected by the ALJ
14  only for "clear and convincing" reasons supported by substantial evidence in the record. Reddick v.
15  Chater, 157 F.3d 715, 725 (9th Cir. 1998) (quoting Lester, 81 F.3d at 830). Where a treating
16  physician's opinion is contradicted by another physician, the ALJ may reject the treating physician's
17  opinion only by providing "'specific and legitimate reasons' supported by substantial evidence in the
18  record for so doing." Id. (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)). The same
19  test applies to examining physicians: the ALJ must give clear and convincing reasons for rejecting
20  uncontradicted opinions, or "specific and legitimate reasons supported by substantial evidence in the
21  record" for rejecting those opinions that have been contradicted. Lester, 81 F.3d at 830-831.

22          Courts within the Ninth Circuit have recognized various reasons deemed sufficient for the
23  ALJ to disregard a treating or examining physician's opinion. These reasons include: conflicting
24  medical evidence, the absence of regular medical treatment during the alleged period of disability,
25  and the lack of medical support for physicians' reports that are based substantially on the claimant's
26  subjective complaints of pain. Flaten v. Secretary of Health & Human Svcs., 44 F.3d at 1453, 1463-
27  64; Fair, 885 F.2d at 604. The ALJ also may disregard a physician's opinion that is "brief and
28  conclusionary in form with little in the way of clinical findings to support [its] conclusion."

30

1 Magallanes, 881 F.2d at 751 (quoting Young v. Heckler, 803 F.2d 963, 968 (9th Cir. 1986). In
2 contrast, vague, broad or generalized reasons are insufficient grounds for the ALJ to reject a treating
3 physician's opinion. McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989).

4      Here, Dr. Cunningham had opined that Claimant suffered "very serious limitations secondary
5 to low back pain and neck pain." (AR 20, 396-400). ALJ Baker rejected Dr. Cunningham's opinion
6 because it was based on statements by a claimant whom the ALJ found incredible: "Dr. Cunningham
7 is obviously relying on what his patient is telling him. I am not confident enough of the claimant's
8 credibility to give this assessment much weight." (AR 20). However, given that the ALJ's
9 credibility assessment with respect to claimant has been remanded for further consideration, see
10 discussion, supra, it follows that his rejection of Dr. Cunningham's opinion must be reconsidered as
11 well. Barbato v. Commissioner of Social Security, 923 F. Supp. 1273, 1277-78 (C.D. Cal. 1996)
12 (remand for additional administrative proceedings was proper where adverse decision of ALJ failed
13 to provide sufficient justification for disregarding treating physician's opinion, particularly where
14 "automatic reversal would bestow a benefits windfall upon an undeserving, able claimant").

15 **6.    Whether the ALJ erred in failing to use a vocational expert.**

16      At step four, the ALJ found that claimant has no past relevant work. At step five, the ALJ
17 found that "[b]ut for claimant's [drug addiction and alcoholism], claimant has the residual functional
18 capacity to perform the physical exertional and non-exertional requirements of [light] work except
19 for greater than occasional climbing, stooping, crouching, and crawling." (AR 21). The ALJ thus
20 found that "but for" Claimant's substance abuse problem, she is able to perform light work, and
21 applied the Grids to determine that Claimant was "not disabled." The ALJ explained that his
22 reliance on the Grids was appropriate given that "claimant's capacity for the full range of light work
23 has not been significantly compromised by her additional nonexertional limitations." (Id.) Claimant
24 asserts that the ALJ erred by using the Grids in lieu of the testimony of a vocational expert.

25      At step five the burden shifts to the Commissioner to "show that the claimant can perform
26 some other work that exists in significant numbers in the national economy, taking into
27 consideration the claimant's functional capacity, age, education, and work experience." Tackett v.
28 Apfel, 180 F.3d 1094. 1100 (9th Cir.1999). This can be achieved by the testimony of a vocational

1  expert or by reference to the Medical-Vocational Guidelines or "Grids." The Grids are based on
2  strength factors, and are appropriately used when a claimant suffers from physical-exertional
3  limitations, i.e. strength limitations. However, the Grids may be applied in lieu of testimony from a
4  vocational expert "only when the grids accurately and completely describe the claimant's abilities
5  and limitations" and "only when the claimant is able to perform the *full range* of jobs in a given
6  category." Tackett v. Apfel, 180 F.3d at 1101-1102, quoting in part Jones v. Heckler, 760 F.2d 993,
7  998 (9th Cir. 1985). Conversely, when a claimant suffers from non-exertional limitations which
8  may limit the claimant's functional capacity in ways not contemplated by the Grids, use of the Grids
9  is not appropriate. Id.; see Desrosiers v. Secretary of Health and Human Services, 846 F.2d at 577-
10  578.

11       In this case, Claimant suffers from a panoply of mental impairments and pain, which
12  constitute non-exertional limitations that are not contemplated by the Grids. These non-exertional
13  limitations, when combined with Claimant's exertional limitations, may impact Claimant's ability to
14  perform the full range of applicable work for a full workday. The ALJ qualified his determination
15  that Claimant can perform the full range of light work with two limitations: a "[b]ut for" exception
16  relating to Claimant's drug and alcohol addiction (AR 21), and an "except for" limitation relating to
17  Claimant's inability to perform anything more than occasional climbing, stooping, crouching, and
18  crawling (AR21). Under these circumstances, the Court concludes that it was error for the ALJ to
19  rely on the Grids, coupled with a premature finding regarding drug and alcohol addiction, to support
20  a finding of "not disabled." A remand is required to allow the ALJ to consider the testimony of a
21  vocational expert regarding claimant's RFC, including her ability to work under stress for a full
22  workday, and her ability to perform light work for a full workday, and whether there are a significant
23  number of jobs in the national economy that Claimant can do. See Tackett, 180 F.3d at 1102-1103.

24                          **CONCLUSION AND RECOMMENDATION**

25       For the reasons discussed above, this Court finds error in the ALJ's disability determination
26  analysis and that such analysis was not based on proper legal standards. Accordingly, this Court
27  RECOMMENDS:

28       1.    That claimant's social security complaint be GRANTED;

32

1    2.   That this matter be REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for
2   development of the record and further consideration, consistent with this decision, of claimant's
3   status as disabled, including without limitation, whether claimant has sufficient residual functional
4   capacity, defined as what an individual can still do, despite limitations, to perform claimant's past
5   work, if any, 20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a), 416.920(e)-(f); and whether on the basis of
6   claimant's age, education, work experience, and residual functional capacity, claimant can perform
7   any other gainful and substantial work within the economy, 20 C.F.R. §§ 404.1520(g), 416.920(g);
8   and in the event the ALJ determines that claimant is disabled under the five-step inquiry, to consider
9   whether substance abuse is a contributing factor material to that determination pursuant to 20 C.F.R.
10  § 416.935.

11   3.   That Judgment be ENTERED for claimant Lillian Alonzo and against Defendant
12  Michael Astrue.

13        This Report and Recommendation is submitted to the United States District Judge assigned
14  to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72-304. No later
15  than eleven (11) days after service of this Report and Recommendation, any party may file written
16  objections to this Report and Recommendation with the Court and serve a copy on all parties and the
17  magistrate judge and otherwise in compliance with this Court's Local Rule 72-304(b). Such a
18  document should be captioned "Objections to Magistrate Judge's Report and Recommendation."
19  Responses to objections shall be filed and served no later than eleven (11) days after service of the
20  objections and otherwise in compliance with this Court's Local Rule 72-304(d). A copy of the
21  responses shall be served on the Magistrate Judge. The District Judge will review the Magistrate
22  Judge's Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised
23  that failure to file objections within the specified time may waive the right to appeal the District
24  Judge's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

25

26  **IT IS SO ORDERED.**

27                                              **/s/ Theresa A. Goldner**
     Dated: March 7, 2007
28                                              Honorable Theresa A. Goldner
                                                United States Magistrate Judge

33